| UNITED STATES DISTRICT COURT | SOUTHERN DISTRICT OF TEXAS |
|---|---|

KEN FREELAND, §
　　　　　　　　　　　　　　§
　　　　　　Plaintiff, §
　　　　　　　　　　　　　　§
*versus* § CIVIL ACTION H-07-1102
　　　　　　　　　　　　　　§
JANE TUCKER BRADELY, *et al.,* §
　　　　　　　　　　　　　　§
　　　　　　Defendants. §

## Opinion on Dismissal

*1.   Introduction.*

Ken Freeland has sued several employees of the Pacifica radio network for defamation, abuse of process, and violations of his political liberties. Making a report to the police, statements in that report, and exclusion from the station do not meet the legal requirements for an action at law.

*2.   Plaintiff.*

Ken Freeland is a long-time participant in the activities of Pacifica. It is a radio network for citizen participation in programming, making it an outlet for community creativity that contributes to understanding among peoples. It is supported by donations and grants of national tax revenue. Freeland has been a director of the Houston station and of the national board, and he currently is a member of the local board. The local board is advisory only. Organizational control is exercised by the foundation's national board in California.

*3.   Defendants.*

Freeland has sued three people. Tucker Bradley is an employee of the Houston station. She conducted the elections of national representatives from Houston. Duane Bradley is the station manager for Houston, who is an employee of the national office. The two Bradleys are not related. The third one, Lester Radke, works for Pacifica in California.

4.  *Events.*

In October of 2006, Freeland was a candidate for the local station's board. The Houston membership elects the board members. In the context of that campaign, Freeland was at the station in preparation for a call-in show for the candidates to answer listeners' questions. He objected to the people whom Tucker had selected to monitor the calls. She made one change, but Freeland kept protesting.

As the dispute deteriorated, Tucker apparently raised her voice to Freeland, telling him to shut up. He concedes that in response he yelled in her ear. Tucker told Freeland that he could not be on the program and that he must leave the building or she would call the police. He left. Tucker complained to the Houston police. Freeland complained to Radke, who was serving as Pacifica's national supervisor of elections.

Freeland was re-elected to the board. He was then nominated for election by his peers on the local board to be a director on the national board. Immediately before that election in early January, Duane Bradley sent a memorandum to people associated with the station describing the altercation and instructing them to call the police if Freeland attempted to enter the station. He also posted it on the front door. At the same time, Tucker Bradley sent an e-mail to similar participants about the dispute, describing Freeland as the aggressor.

Later, as a member of the elections committee, Freeland tried to enter the station to attend a meeting of it. Someone at the station called the police. When the officer read Duane Bradley's memorandum, he told Freeland to leave, and he did.

In late February, Radke was a guest on a California station's show. A caller asked about the treatment of Freeland, and Radke responded that he had attacked Tucker Bradley.

5.  *Procedure.*

Freeland sued in Texas state court, and the defendants removed it based on his assertion of a federal question. Freeland has asked that it be remanded; he now says that no federal question is essential to the case. His compliant, however, includes a specific charge of a civil conspiracy to violate his "right to free speech guaranteed by the United

States and Texas" constitutions. Later, he pleads that they are chilling his constitutional rights. He carefully pleads that these private parties are deeply intertwined with governmental power so that their violations of his constitutional rights are governmental acts.

The eight pages describe a transaction that, if his allegations were true, would state a claim under the national Constitution.

6. *Access to Land.*

Freeland asks that Duane Bradley be enjoined to allow him to visit the station for purposes of his roles as director, committeeman, and member. Duane Bradley, the station manager, is appointed and employed by the foundation. He was acting for it when he excluded Freeland.

Although Freeland says that Duane Bradley was malicious – personal or political – in the ban, in the four months that have passed neither the foundation nor the local board have acted to countermand his policy on Freeland. Their tacit consent is agreement – ratification. Freeland does not plead that the local board or foundation bear him the ill will that Duane Bradley does. The ratification makes Duane Bradley's acts those of the foundation.

The nature of a claim to access land makes it a contest between the claimant and the owner. Ordering the foundation's agent – Duane Bradley – to allow Freeland to enter the station is ordering it to allow access to its land; the foundation is a necessary party. *Cf. Ball v. Cundiff*, 127 S.W.2d 502, 504 (Tex. Civ. App.–Galveston 1937, writ dism'd judgm't cor.). Freeland has represented that he will not sue the foundation, making this aspect of his case dead. Technically, he has no standing to assert this claim against these people for access.

7. *Abuse of Process.*

Freeland posits that Tucker Bradley's filing of a complaint and Duane Bradley's calling the police were abuses of process because they were baseless and calculated to injure and intimidate him.

Tucker Bradley filed a complaint with the Houston police. The altercation is described in the officer's interpretation of Tucker Bradley's statement to him. Although Freeland has some quibbles with the wording, the event as he has described it is what the officer showed on the report. If the facts Tucker Bradley told the officer were reasonably accurate, then her secret motivation does not matter. The complaint to the police was proper. *See Martin v. Trevino*, 578 S.W.2d 763, 769 (Tex. Civ. App.–Corpus Christi 1978, writ ref'd n.r.e.).

In thoughtful policing, the officer taking a report of a shouting match did not include Freeland's name. He took enough information so that, if it became a problem again, he could connect the events. The police took no action besides accepting a citizen's complaint. No harm to Freeland was consequent on the report's being filed. The essence of his complaint is that Tucker Bradley and others told everybody that he had shouted at her and she had complained; that is the defamation claim.

8.  *Defamation*.

According to Freeland, Radke defamed him by telling listeners in California about the altercation; Tucker Bradley defamed him by sending messages to foundation-related people about it; and Duane Bradley defamed him by sending and posting his memorandum about the altercation.

All of these acts rely on the same event – the altercation. Secondarily, they may have the additional content of a reference to the police complaint. Freeland pleaded and at the hearing conceded a joint yelling of some vigor. He pleaded a complaint to the police, and it has been introduced. Because the facts in the three defendants' reports were essentially true, he cannot recover for their having been made.

If the statements are viewed as misleading, they were made in the context of a campaign for corporate office. The office is not governmental, but it was conducted through broadcast radio about offices and programs at a charity that is imbued with society's interest in publicly-raised funds for an eleemosynary institution. The scope for tolerable error – what is wrong but still fair – is broader than in personal matters.

Freeland would not expect to be brought to court to defend a claim by Duane

Bradley that he had been defamed by Freeland's campaign that the station's management was corrupt. *See* Petition, ¶ IV, D. The importance of the law's broad tolerance in private speech is shown by the nature of some of Freeland's objections to Duane Bradley's memorandum. For instance, Duane Bradley did not, he thinks, call the people whom he said he did and talk about Freeland and that Radke had also banned him. Assuming these statements to be false, they cannot be in the class of assertions that are likely to injure Freeland's reputation materially. They are the verbal friction of politics – even in a corporate charity.

Freeland was unable to articulate an instance where his lowered reputation had caused quantifiable harm. He was not elected, but that is not a compensable harm; of course he cannot show that his loss was a direct consequence. In the absence of a harm, the law would be allowing a recovery based entirely on Freeland's sense of injustice; the law is not that relativistic and subjective.

Parenthetically, if the claim is that Freeland should be awarded money because of the sheer impudence of Duane Bradley's saying something that was offensive to Freeland or that he said something offensive to Freeland's sensibilities, the law does not protect those interests. If it did, the law might well contravene the Constitution because it cannot allow a citizen to be punished for the mere nature of his ideas or their phrasing. The recovery of money for non-existent harms is equal to punishing the speaker for the idea expressed. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277-78 (1964).

9.   *Free Speech & Assembly*.

Throughout his petition and discussion, Freeland seems to be saying that the actions of the defendants have impeded his ability to speak and assemble. The exclusion probably had those effects. Every constriction on the opportunity to exercise one's rights is not a violation of them.

Obviously, the foundation is not constitutionally obliged to furnish Freeland with a place or an audience. Those are resources of the foundation, and it has a liberty interest in its use of them for its purposes at its discretion. These are not countervailing interests. Freeland's claim is that another must supply him the tools for his speech's being more

effective than otherwise and supply them no matter how he behaves. The foundation's claim is for its own property interest, which is a component of liberty. Our Constitution does not ensure speech rights by falsely "placing at the disposal of the working people . . . .printing presses, stocks of paper, public buildings, the streets, communications facilities and other materials . . . ." Konsitutsiia SSSR (1934)[USSR Constitution] Chap. X, art. 125. We do not do that; neither do we allow other people to commandeer the property of fellow citizens. We do allow everyone freely to express themselves without governmental permission or retribution. We really do *that*.

Apart from the Constitution's effect, the foundation owes a legal duty to its supporters to use their property for its mission. *Cf. Blocker v. State*, 718 S.W.2d 409, 413 (Tex. App.–Houston [1st Dist.] 1986, writ ref'd n.r.e.). The selection of programs, allocation of times for broadcast, quantity of technical assistance, kind and volume of promotion, levels of staffing, hiring staff, and dozens of other choices need to be made; they are policy and operating choices that are controlled and reviewed within the hierarchy of the foundation. Within those management levels, techniques, and affiliations, the participants have no "freedom of speech" among themselves.

If this were the actual government, an employee or manager has no right to come on his schedule, talk when he pleases, or rearrange processes to his liking; more precisely, he has the right to do what he will, but he has no right that it be tolerated by the foundation or to remain part of it.

The foundation is not a governmental operation. It has a subsidy from the United States of less than one-fifth of it budget – just like a lot of farmers. It has a broadcast license that specifies its frequency and wattage. It may also have restrictions on accepting advertising or similar limits to a non-profit operation, and it probably has a reduced license fee. It has a corporate form. Locally, it uses the police just as any other resident would.

Because rights under the Constitution are a citizen's protection from the power of government, the absence of substantial governmental involvement in its operations precludes the foundation from having a government's responsibility to others.

Freeland says that the defendants have devalued the votes of the local members

who voted for him. If true, he has no standing to sue for the injuries of others under the Constitution. He may sue for himself but not other people. *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972).

10.  *Peace Politics, Corporate Politics.*

The leaders of a business are responsible for conducting and ordering its internal workings. This does not license them to break the law – including their fiduciary duties. The law does, however, recognize this duty's complexity and uncertainty, and it grants them the protection of the business judgment rule. *See Pace v. Jordan*, 999 S.W.2d 615, 624 (Tex. App.–Houston [1st Dist.] 1999, pet. denied). Under this rule, when a board of directors makes a good-faith decision based on the information reasonably available to it, the court will not substitute its judgment for the board's.

The foundation's board is aware of the problems with Houston and Freeland. Houston personnel told it about the issue. Freeland complained to it directly that his ban from the station was wrong. It has the information and the ban stands. This court will not interfere with that decision.

The defamation action also fails for a related reason. People who are jointly engaged in an enterprise may discuss with impunity the people and events associated with its operations. No claim for defamation lies if the talk is kept in the "family." In this case, the family is rather large, and it communicates through radio, e-mails, newsletters, memoranda, and meetings large and small. These conversations are at law to be free of fear of litigation. *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). Accusations and other statements do not have to be true, for neither a board meeting or staff memorandum is a grand jury, prosecutor, or petit jury; they are using operating approximations based on imperfect knowledge about the past and on an uncertain future. Their judgments need be sufficient in cost and precision only to conduct the business at hand – based on the discretion of the people responsible for the institution.

11.  *The Intervenors.*

Robert Graham and Bob Carter are members of the local station. Local listeners become members by donating to the station. They then can vote in elections for the local station board.

Graham intervened in the suit when it was in state court. He asks the court permanently to enjoin the station from banning Freeland from its premises. Carter did not file an intervention, but he appeared in this court saying he would like to intervene. Neither has a particularized injury that can be redressed in this case.

Graham's petition says that he voted for Freeland to represent him on the local board. He says that the ban prevents Freeland from fully representing his interests – that he has been disenfranchised. Carter expressed similar concerns at the hearing.

Freeland is still a participating member of the local board. The board has tailored where it holds its meetings to accommodate him. He is still representing Graham, Carter, and all the other members who voted for him. Graham and Carter voted for a representative who shouted at the staff because he did not get his way. Freeland is their choice – with all its consequences.

Freeland – and by extension Graham and Carter – complains that he has not been able to attend certain sub-committee meetings because they took place at the station. If Freeland had not been appointed by the board to the subcommittee, Graham and Carter would have no complaint. If the board removed Freeland from the subcommittee, they would have no complaint.

12.  *Conclusion.*

Tucker Bradley's filing a police report was lawful. Foundation personnel did not defame Freeland. The foundation was not a surrogate for the government that would make it liable for limiting Freeland's speech. The intervenors' complaint is not redressable in an action at law; they got who they wanted.

Freeland seeks a vindication of his First Amendment rights. He would have this court ignore the same rights of the foundation. The foundation is required to follow its own bylaws and procedures, and it is free to act, assemble and speak. It has given

Freeland the opportunity to participate as an elected member in board meetings. It is not required to make people who are intimidated by or uncomfortable with Freeland associate with him.

      He has filed a civil rights action against his fellow members based on incivility at worst. The purpose of a free market in speech and ideas is that what we take for the truth will be revised and refined. That discussion may be vigorous, contentious – even demeaning and vitriolic. A speaker in that discussion may not, however, impose himself physically in a private setting to the extent that he obstructs its operation.

      Signed on July 8, 2007, at Houston, Texas.

                                              Lynn N. Hughes
                                   United States District Judge